UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARK H. MILLER,

                            Plaintiffs,

    -against-

THE COUNTY OF NASSAU, AND THE
NASSAU COUNTY SHERIFF'S OFFICE,

                            Defendants.

**MEMORANDUM OF
DECISION AND ORDER**
10-CV-3358 (ADS)(AKT)

----------------------------------------------------------X

**APPEARANCES:**

**LAW OFFICES OF BARRY BLACK, PC**
*Attorney for the Plaintiff*
479 S. Oyster Bay Rd.
Plainview, NY 11803
    By: Barry Black, Esq.

**BEYS, STEIN & MOBARGHA LLP**
*Attorneys for the Plaintiff*
The Chrysler Building
405 Lexington Avenue
7th Floor
New York, NY 10174
    By: Jason Hunt Berland, Esq.

**OFFICE OF THE NASSAU COUNTY ATTORNEY**
*Attorney for the Defendants*
One West Street
Mineola, New York 11530
    By: Michael Ferguson, Deputy County Attorney

**SPATT, District Judge.**

Mark Miller commenced this civil rights action pursuant to 42 U.S.C. § 1983 against the County of Nassau ("the County"), and the Nassau County Sheriff's Office ("the Sheriff's Office") (collectively, "the Defendants") asserting claims for false arrest and false imprisonment. Presently before the Court is the Defendants' motion for summary judgment pursuant to Federal

1

Rule of Civil Procedure 56 ("Fed. R. Civ. P. 56") to dismiss the complaint in its entirety. For the reasons set forth below, the Court grants the Defendants' motion.

## I. BACKGROUND

On June 26, 2009, a Nassau County Family Court Temporary Order of Protection ("TOP") was issued ex-parte to Mark Miller's former wife. (Def.'s Rule 56.1 Stmt., ¶ 4.) The Defendants claim that between June 26, 2009 and July 21, 2009, Miller had been avoiding service of the TOP by deputy sheriffs at his home and place of business. (Id. at ¶ 12.) Miller claims that while he knew deputies were trying to contact him, and speculated that there may have been a TOP against him, he was not certain as to why. (Pl.'s Response to Def's Rule 56.1 Stmt., ¶ 12.) In any event, it is undisputed that Miller was avoiding the deputies. In addition, on the morning of July 21, 2009, Miller appeared at Family Court and despite the judge's request, he declined to accept service of the TOP. (Def.'s Rule 56.1 Stmt., ¶¶ 14–15.)

On July 21, 2009, after Miller refused to accept service of the TOP at Family Court, Deputy Sheriffs Beirne and Rockwood were assigned by their lieutenant to serve Miller with the TOP. (Id. at ¶ 25.) The lieutenant told the Deputy Sheriffs that Miller would be picking up his children at his ex-wife's house at approximately 6:30 pm that day. (Id.) They were also told that Miller had been avoiding service and Deputy Beirne knew that Miller was an attorney. (Id. at ¶ 26.) Serving TOPs is a large part of a deputy sheriff's duties. (Id. at 23–24.) Since TOPs are used to protect individuals, the Defendants explain, and the Plaintiff does not dispute, that they should be served as soon as possible. (Id.)

On July 21, 2009, at 6:30 pm, Miller drove to his former wife's house to pick up his minor children. (Id. at ¶ 16.) At the time, Miller had a hand-held video camera with him, which was recording while Miller approached his ex-wife's house. (Id. at ¶¶ 17–18.) As Miller

approached, he saw a marked sheriff's car further down the block, containing Deputies Beirne and Rockwood. (Id. at ¶ 27.) Consequently, Miller drove away, but the Deputies followed him around the block until he returned to his ex-wife's house. (Id. at ¶¶ 28–29.) Miller then honked his horn to indicate that his children should come out of the house. (Id. at ¶ 29.) When Deputy Beirne approached Miller's car with papers in his hand and asked Miller to roll down the window, Miller told him to go away. (Id. at ¶¶ 30–31.) The Deputy began to bang on the window to get Miller's attention and told Miller that, "the children are not coming out until you take these papers." (Id. at ¶¶ 32–33.) In his deposition, Deputy Beirne stated that he made this statement to Miller because he assumed that the mother would not let the children out of the house unless the papers were served. (Id. at ¶ 34.) Miller contests this statement and claims that it is pure "speculation". (Pl.'s Response to Def's Rule 56.1 Stmt., ¶ 34.)

The Defendants allege that Deputy Beirne then stepped away from Miller's car because he was unable to effect personal service. (Def.'s Rule 56.1 Stmt., ¶ 35.) However, Miller claims that the Deputy could have effectuated service by leaving the TOP in his general vicinity. (Pl.'s Response to Def's Rule 56.1 Stmt., ¶ 35.) After Beirne stepped away from the car, Miller told his children to hurry up and get in the car. (Def.'s Rule 56.1 Stmt., ¶ 36.) Once the children were inside the vehicle, Miller drove away at what the Defendants claim was a high rate of speed. (Id. at ¶ 38.)

Even though the Deputies followed Miller as he drove away, they claim that it was not their intention to try to stop him at that time. (Id.) The Defendants allege that they began following Miller only after they saw him make a left turn without signaling. (Def.'s Rule 56.1 Stmt., ¶ 39.) After allegedly observing Miller turn again without signaling, pass a vehicle on the right shoulder, and cross a yellow-line into oncoming traffic, (Id. at ¶ 40), the Deputies put on

their overhead lights and sirens in an attempt to pull Miller over. (Id. at ¶ 41). The Plaintiff denies that he violated any traffic laws. (Pl.'s Response to Def's Rule 56.1 Stmt., ¶ 45.)

Despite seeing the deputy vehicle behind him with lights on and hearing the Deputies on the intercom telling him to pull over, Miller kept driving. (Def.'s Rule 56.1 Stmt., ¶¶ 42–43.) Approximately ten minutes after leaving his ex-wife's house, Miller was eventually stopped and arrested. (Id. at ¶ 49.) He was charged with eight Vehicle and Traffic Law ("VTL") infractions and five penal law violations, including two counts of Endangering the Welfare of a Child, Obstructing Government Administration, Unlawfully Fleeing a Police Officer, and Reckless Driving. (Id. at ¶ 49.)

On January 29, 2010, after reviewing the videotape of the incident created by Miller, Assistant District Attorney ("ADA") Stacy Albin, who had been assigned to the case, dismissed all of the charges brought against Miller. (Id. at ¶ 58.) However, ADA Albin stated that while Miller's videotape of the relevant incident "calls highly into question some" of the VTL infractions, it does not "totally disprove all of them." (Albin Dep. 163:6–163:15, Feb. 2, 2012.) Nevertheless, the charges were dismissed and the file was forwarded to public corruptions for further investigation as to whether the Deputies acted wrongfully. (Def.'s Rule 56.1 Stmt., ¶ 58.)

After dismissal of the case, ADA Albin, along with Steve Schwartz, her bureau chief, met with Bernadette Ford, the Deputy Bureau Chief in the Public Corruption Bureau, and ADA Marshall Trager, the Bureau Chief. (Id. at ¶ 59.) According to ADA Albin, she and Schwartz had a difference of opinion with the ADAs from the Public Corruption bureau about whether there was sufficient evidence to go forward with prosecution for obstructing government administration. (Albin Dep. 161:7–162:13.)

On July 21, 2010, as a result of the aforementioned incidents, Miller commenced the instant action by filing a complaint against The County of Nassau and The Nassau County Sheriff's Office. Viewing the complaint in the light most favorable to the Plaintiff, the Court construes the complaint as asserting that: (1) the Defendants acted willfully, knowingly, and with specific intent to deprive the Plaintiff of his constitutional rights; and (2) the Defendants, "through its senior officers and policymakers, supervisors and other policymakers, pursued policies, practices and customs that were a direct and proximate cause of the unconstitutional rights alleged . . . and were the result of deliberate indifference. The policies include, but are not limited to, the failure to properly screen, supervise, disciple, transfer, counsel or otherwise control police officers, including the officers who arrested Claimant who are known or should have been known to engage in improper use of the arrest power and force." On July 16, 2012, the Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56.

## II. DISCUSSION

### A. Legal Standard

Summary judgment pursuant to Fed. R. Civ. P. 56(c) is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most

favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 396 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

If the moving party meets its initial burden, "the nonmoving party must come forward with 'specific fact showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). If the nonmoving party meets this burden, then the moving party must show that "little or no evidence may be found in support of the nonmoving party's case," in order for summary judgment to be granted. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

**B. Claims Against the Nassau County Sheriff's Department**

Mark Miller asserts various claims against both the Nassau County Sheriff's Department and the County of Nassau. However, the claims against the Nassau County Sherriff's Department cannot be sustained, because under New York law, the Nassau County Sheriff's Department cannot be sued separately from the County of Nassau.

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." Mendoza v. County of Nassau, 11-CV-02487 SJF AKT, 2012 WL 4490539 at *4 (E.D.N.Y. Sept. 27, 2012) (citation omitted). In accordance with this law, it is

6

well established that, since the Nassau County Sheriff's Department is an administrative arm of Nassau County, without a separate legal identity, the claims against it are redundant to the claims against Nassau County. See, e.g., Sorrell v. Incorporated Vill. of Lynbrook, No. 10–cv–49, 2012 WL 1999642, at *5 (E.D.N.Y. June 4, 2012) (dismissing claims against the Nassau County Police Department because it is merely an administrative arm of Nassau County, which had been named separately as a defendant for each of the plaintiff's claims); Wharton v. County of Nassau, No. 07–cv–2137, 2010 WL 3749077, at *3 (E.D.N.Y. Sept. 20, 2010) (dismissing claims against the Nassau County Police Department because, as an administrative arm of Nassau County, it lacked the capacity to be sued); Melendez v. Nassau County, No. 10–CV–2516 (SJF)(WDW), 2010 WL 3748743, at *5 (E.D.N.Y. Sept. 17, 2010) (dismissing the plaintiff's claims against the Nassau County Sheriff's Department Division of Correction and the Nassau County Correctional Center because those entities are "administrative arms of Nassau County, and therefore are not suable entities").

Accordingly, the Court grants the Defendants' motion for summary judgment dismissing all claims against the Nassau County Sheriff's Department. See Pooler v. Hempstead Police Dep't, --- F. Supp. 2d ----, 2012 WL 4060743, at *1 n.4 (E.D.N.Y. Sept. 14, 2012) ("As a threshold matter, the Court notes that the Nassau County Sheriff's Department is an "administrative arm[ ]" of the municipal entity, the County of Nassau, and thus lacks the capacity to be sued as a separate entity. . . . As such, the Court will construe plaintiff's complaint as lodged against the County of Nassau.").

**C. Claims Against the County of Nassau**

Now that the Court has dismissed the claims against the Sheriff's Department, the Court will proceed to analyze the Section 1983 claims as asserted against the County of Nassau.

The Plaintiff brings his §1983 claim against the County of Nassau, claiming that the County, "through its senior officers and policymakers, supervisors and other policymakers, pursued policies, practices, and customs that were a direct and approximate cause of the unconstitutional rights [sic] alleged herein and were the result of deliberate indifference." (Complt., ¶ 17.) In his Complaint, the Plaintiff notes that these "policies include, but are not limited to, the failure to properly screen, supervise, discipline, transfer, counsel or otherwise control police officers, including the officers who arrested [the Plaintiff] who are known or should have been known to engage in improper use of the arrest power and force." (Complt., ¶ 19.) In his Opposition to the Motion for Summary Judgment, the Plaintiff for the first time alleges specifically that the Defendants failed to properly train its deputies in the limitations of their duties.

Despite raising these claims, however, in the Court's view, the Plaintiff has not put forth any argument or evidence as to the existence of a genuine issue of material fact precluding the dismissal of these claims.

In order to bring a Section 1983 claim, a plaintiff must demonstrate that (1) "[t]he conduct at issue '[was] committed by a person acting under color of state law,'" and (2) that the conduct "'deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010), cert. denied sub nom Cornejo v. Monn, —— U.S. ——, 131 S. Ct. 158 (2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

In his opposition, the Plaintiff first argues that there is a genuine issue of material fact as to whether the Deputies had probable cause to arrest him and whether they violated his right to be free from unlawful arrest, detention, and imprisonment. (Pl. Opp. at 12.) The focus of Miller's argument is that under N.Y. Family Court § 152-b(c), the Deputies were only permitted to serve him with the TOP at an address listed on the TOP. (Id. at 14–15.) The Plaintiff claims that the Deputies improperly tried to serve him at his ex-wife's house, which was not listed on the TOP. (Id. at 15.) In addition, the Plaintiff alleges that the Deputies continued to follow him after he exercised his right to refuse service, even though he had his minor children with him. (Id.)

While the Plaintiff claims that these incidents violated his Fourth Amendment right to "be secure in [his] persons, houses, papers and effects against unreasonable search and seizure…", he raises this for the first time in his opposition. The Plaintiff's Complaint states only that the Defendants violated his "right to be free from police harassment and intimidation… [his] right to access to the courts… [his] right to be free from malicious prosecution, and malicious abuse of process…[his] right to due process of law…" and his "right to be free from unlawful arrest, detention, and imprisonment." (Cmpl., ¶¶ 3;12.) "It is well established that a party cannot assert a claim for the first time in its motion papers." Deskovic v. City of Peekskill, Nos. 07–CV8150 (KMK), 07–CV–9488 (KMK), 2012 WL 4435316, at *14 n. 27 (S.D.N.Y. Sept. 25, 2012) (citation omitted).

However, regardless of the Plaintiff's theory of the predicate constitutional violation and whether he has raised any genuine issue of material fact in this regard, is ultimately not relevant. This is because even assuming that this Court were to find that the Plaintiff met his burden of proving that the Deputies deprived him of one of these

constitutional rights, a government entity, such as the County of Nassau, is "not vicariously liable under § 1983 for [its] employee['s] actions." Connick v. Thompson, -- U.S. ---, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (citation omitted) (internal quotation marks omitted). Instead, the government can be held "responsible only for [its] *own* illegal acts." Id. In order to impose liability on a government entity under Section 1983, a plaintiff may "show two basic elements: (1) 'the existence of a municipal policy or custom…' and (2) 'a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights.'" Harper v. City of New York, 424 F. App'x 36, 38 (2d Cir. 2011) (citing Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)). In other words, a municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Also, in City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court determined that deliberate indifference training may give rise to Section 1983 municipal liability.

Here, even assuming arguendo that the absence of an underlying constitutional violation did not preclude a Monell claim in this case, the Court concludes that the County would still be entitled to summary judgment because of the absence of any evidence of an unconstitutional policy, practice, or custom by the County, or a failure to supervise or train, as it relates to the issues in this case.

**1. As to the Existence of a Policy or Custom**

In order to impose liability on a government entity, a plaintiff must first demonstrate "the existence of a municipal policy or custom." Id. "The policy or custom need not be

memorialized in a specific rule or regulation." Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (citing Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, such municipal policies "include[] the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S. Ct. at 1359 (citation omitted). Also, in "limited circumstances," a municipality can be liable under §1983 for its failure "to train certain employees about their legal duty to avoid violating citizens' rights…" Id. For this reason, a policy, custom, or practice of the entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" Patterson, 375 F.3d at 226 (quoting Kern, 93 F.3d at 44).

Here, the Plaintiff claims that the Defendant "failed to train its sheriffs (i) to be cognizant of the constitutional rights of individuals with whom they come into contact; and (ii) to regard the known or obvious consequences of their actions." (Pl. Opp. at 13.) Surprisingly, the Plaintiff makes no specific allegation anywhere that the Defendants failed to train its employees about VTL infractions or whether there is probable cause for an arrest. This is despite the fact that these allegations appear to form the basis of Plaintiff's underlying claim and, according to the Plaintiff, is "at the heart of this case." (Id. at 12.) Instead, Miller alleges that the Defendants failed to train its employees on how to properly serve a TOP. (Id. at 15.)

As a preliminary matter, the Court doubts whether the Plaintiff can raise a failure to train claim when it never expressly did so before the filling of his Opposition. Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint."); Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999) ("We need not consider this argument because it is raised for the first time in his

11

reply brief." (citation omitted)). However, viewing the Plaintiff's complaint in the light most favorable to the Plaintiff, the allegation in the Complaint that the Defendant failed to "properly…supervise…counsel or otherwise control police officers" could be construed as a failure to train claim. (Cmpl., ¶18.) In addition, the Plaintiff alleged that the Defendant "pursued…practices and customs that were a direct…cause of the" alleged constitutional violations". (Cmpl., ¶17.) Construing this language generously in the Plaintiff's favor, this allegation could be stating that the Defendants had a "practice and custom" of not training its employees.

Thus, the question posed to the Court is whether the Plaintiff has adequately demonstrated a genuine issue of material fact as to whether the Defendants failed to train employees on how to properly serve a TOP or "about their legal duty to avoid violating citizens' rights…" Connick, 131 S. Ct. at 1359. When a Plaintiff's §1983 claim rests solely on a failure to train allegation, the "municipality's culpability…is at its most tenuous . . . " Id. (citation omitted). A Plaintiff must "allege facts tending to support, at least circumstantially, an inference that [(i)] such a" failure to train exists, Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012), and that (ii) the "failure to train…amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact,'" Connick, 131 S. Ct. at 1370 (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989)) (alteration in original).

### a. Inference of a Failure to Train

First, as set forth above, in order to prove a failure to train, a plaintiff must first "allege facts tending to support, at least circumstantially, an inference that such a" failure to train exists. 847 F. Supp. 2d at 576. Here, the Plaintiff's claim appears to be, at least in part, that the

Defendants failed to train the Deputy Sheriffs on how to properly serve a TOP. (Pl. Opp. at 15.) The Plaintiff attempts to support an inference of a failure to train in the service of TOPs by asserting that because both Deputy Sheriffs Beirne and Rockwood testified that they had been trained in New York State's Family Court Act and the Penal Law, (Beirne Dep. 82:9–16, Dec. 20, 2011; Rockwood Dep. 11:4–8, Dec. 20, 2011), and because the Deputies improperly served the Plaintiff, it is evident that the Defendant failed to properly train the Deputies. The Plaintiff also claims that the deposition of Deputy Rockwood indicates that Rockwood believes that he had right to indefinitely follow a person who refuses to accept service. (Rockwood Dep. 52:14–16.) However, later in his deposition, Rockwood clearly stated that this is not his belief. (Rockwood Dep. 53:1–6.) Furthermore, while the Deputies testified that they have served TOPs over a hundred times before, (Beirne Dep. 39:20–40:2; Rockwood Dep. 12:20–13:16), the Plaintiff provides no proof of any other incident where the Deputies *improperly* served a TOP.

Therefore, the Plaintiff is alleging that the single incident at issue in this case is proof that the Defendant failed to properly train the Deputies on how to serve TOPs. However, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991); see Pierce, 2009 WL 749862 at *6 (finding the plaintiff had presented no factual allegations "other than the events which took place at plaintiff's residence"; "an inference of a custom or policy cannot be drawn from a single incident in the complaint") (internal quotation omitted).

Further, the Plaintiff has not adduced any evidence that deficiencies existed in the County's manner or practice of training and supervision. See, e.g., Anthony v. City of New York, 339 F.3d at 140 (finding summary judgment appropriate where plaintiff made conclusory

allegations regarding failure to train, but failed to adduce facts evidencing lack of training program); see Cintron v. Shauwecker, 2008 WL 640628 at *4 (finding summary judgment appropriate where plaintiff alleged failure to train, but "failed to mount any meaningful attack on the formal training and disciplinary review procedures employed by the [defendant]"); Signorile, 887 F. Supp. at 423 ("plaintiffs [have not] identified specifically the procedures that should have been developed or that were developed but not implemented or enforced, much less established that the failure to develop, implement or enforce any such procedure was closely related to the ultimate injury") (internal quotation omitted). As such, the Plaintiff has not "allege[d] facts tending to support . . . an inference that such a" failure to train exists. Santos v. N.Y. City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

### b. Deliberate Indifference

Even if the Plaintiff did allege facts that tended to infer that there was a failure to train, he has not met his additional burden of demonstrating a genuine issue of material fact as to whether the Defendant's "failure to train . . . amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick, 131 S. Ct. at 137–71 (citing Harris, 489 U.S. at 388) (alteration in original). This stringent "deliberate indifference" standard requires proof that the government policymakers were on "actual or constructive notice that a particular omission in their training program caused city employees to violate citizens' constitutional rights," and that the policymakers nonetheless chose to retain that training program. Connick, 131 S. Ct. at 1360 (citing Bd. of County Com'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 407, 117 S. Ct. 1382, 1390, 137 L. Ed. 2d 626 (1997)). This usually requires proof of "a pattern of similar constitutional violations by untrained employees." Connick, 131 S. Ct. at 1354 (citing Brown, 520 U.S. at 409).

Here, the Plaintiff offers no proof that there was "a pattern of similar constitutional violations by untrained employees." Id. While the Deputies testified that they have served TOPs over a hundred times before, (Beirne Dep. 39:20–40:2; Rockwood Dep. 12:20–13:16), the Defendants correctly notes that, "there [is not] . . . proof of prior acts of constitutional or statutory deprivations of citizens' rights by the deputies…" or any other employees of the Defendants. (Def. Mem. at 22–23.) Therefore, there is no proof of "a pattern of similar constitutional violations by untrained employees." Connick, 131 S. Ct. at 1354 (citing Brown, 520 U.S. at 409). Even assuming that there was a pattern of violations, the Plaintiff asserts no facts in his Complaint or in his Opposition to the Summary Judgment to even circumstantially infer that the Defendants were on actual or constructive notice of the alleged failure to train their employees before the incident at issue in this case.

The Court recognizes that "[i]n a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." Connick, 131 S. Ct. at 1361 (citing Brown, 520 U.S. at 409). For instance, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390 (1989).

Here, however, the Plaintiff has made no allegation that the need for more training was "so obvious" or that the alleged inadequacy of training is "so likely to result in the violation of constitutional rights." Id. at 390. Furthermore, the Plaintiff has not pointed to and the Court has not uncovered any case where a government entity was sued because the police followed a

plaintiff in an attempt to serve him with a TOP. Therefore, it cannot be said that alleged inadequacy of training here was "so likely to result in [a] violation of constitutional rights." Id.

As such, the Plaintiff has not met his additional burden of proving that the Defendant's "failure to train . . . amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick,131 S. Ct. at 137–71 (citing Harris, 489 U.S. at 388) (alteration in original).

### 2. As to a Causal Connection Between the Policy and the Deprivation

Finally, even assuming that there was as a failure to train and that the Defendant was deliberately indifferent to the consequences of that lack of training, the Plaintiff still needs to show "'a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights.'" Harper, 424 F. App'x at 38 (2d Cir. 2011) (citing Vippolis, 768 F.2d at 44 (2d Cir. 1985)). In order for a plaintiff "to establish the requisite causal connection between his injuries and a municipal policy of inadequate training, he must make some showing that specific deficiencies in the training given police officers led the misbehaving officer to engage in the alleged misconduct." Cippolis v. Vill. of Haverstown, 768 F.2d 40, 45–46 (2d Cir. 1985).

Here, the Plaintiff claims that the Deputies, along with the Defendant, violated his "right to be free from police harassment and intimidation . . . [his] right to access to the courts . . . [his] right to be free from malicious prosecution, and malicious abuse of process . . . [his] right to due process of law . . ." his "right to be free from unlawful arrest, detention, and imprisonment," (Compl., ¶¶ 3;12), and his right to "be secure in [his] persons, houses, papers and effects against unreasonable search and seizure . . . " (Pl. Opp. at 15).

Only the Plaintiff's first alleged violation of police harassment could reasonably be said to bear any causal connection to the Plaintiff's claim that the Deputies were trained improperly

16

to follow someone who refuses to accept a TOP.  Again, while the Plaintiff does allege that the Deputies did not have probable cause to arrest him because he did not in fact violate any provisions of the VTL, the Plaintiff makes no allegation anywhere that these actions resulted from a failure to train.  (Pl. Opp. at 12.)  In the Court's view, the only failure to train claim raised by the Plaintiff is that there was a failure to train employees about how to properly serve TOPs. (Id. at 15.)

To prove the requisite causal connection with this one remaining violation, the Plaintiff "must make some showing that *specific deficiencies* in the training" on how to serve TOPs "led the misbehaving [Deputies] to" improperly follow him after he refused to accept service of the TOP and that this resulted in a violation of his right to be free from police harassment and intimidation.  Cippolis, 768 F.2d at 45–46 (emphasis added).

However, just as the Plaintiff has failed to show that there was a general inadequacy of training, he has also failed to point to any specific deficiencies in the training that would have led the Deputies to follow someone who refuses to accept a TOP.  The Plaintiff's only offered proof of a deficiency in training is the resulting incident at issue in this case.  Id.  Yet "more proof than the single incident [at issue] will be necessary in every case to establish . . . the requisite . . . causal connection between the 'policy' and the constitutional deprivation."  City of Oklahoma City v. Tuttle, 471 U.S. 808, 824, 105 S. Ct. 2427, 2436, L. Ed. 2d 791 (1985).  Therefore, the Plaintiff has not alleged facts sufficient to establish the requisite "causal connection" between the alleged deficiency in training, and the Deputies' failure to serve the TOP correctly.  As a result, it cannot be said that a "causal connection" exists between the alleged training deficiency and the alleged violation of Miller's right to be free from police harassment and intimidation.

### III. CONCLUSION

For the foregoing reasons it is hereby:

**ORDERED**, that the Defendants' motion for summary judgment dismissing Mark Miller's claims against the Nassau County Sheriff's Department is GRANTED; and it is further

**ORDERED,** that the Defendants' motion for summary judgment dismissing Mark Miller's Section 1983 claims against the County of Nassau is GRANTED; and it is further

**ORDERED,** that the Clerk of the Court is respectfully directed to mark this case as closed.

**SO ORDERED.**
Dated: March 19, 2013
Central Islip, New York

                                                   */s/ Arthur D. Spatt*
                                                 ARTHUR D. SPATT
                                              United States District Judge